24-1123 NRA Group against Durenleau and Bateshevsky. Good morning, Your Honors. I would like to reserve three minutes for rebuttal.  May it please the Court, my name is Paige McDonald-Mathis and I represent the impellant NRA Group LLC in the appeal that's presently before this honorable court. This case stems from Appellee's time as employees of NRA and concerns very specific and intentional actions taken by each of the appellees on January 6th and January 7th, 2021 to gain unauthorized access into NRA's computer network and to steal NRA's computer. We've got the facts. We've got the facts, but when you say unauthorized, why was it unauthorized? Wasn't she Durenleau, I guess that's how it's pronounced, told to get me this information? I don't care how you do it, don't want to know how you do it, just get it by January 6th? I'm sorry, I didn't hear quite clearly. There was a deadline for something to be done. So to be clear, and this is an essential part of the disputed material facts that the district court did not pay careful attention to, and that is, what needed to be done was a fee had to be paid to the state of Wyoming through an NMF... Oh, we've got all that. So it was a... She was out on COVID leave. Yes. This needed to be done. The license was lapsing. It was a 9-1-1 type of situation. Couldn't go to the office. The boss, she couldn't go in. She didn't have a company computer. The boss called and said, we need this. Okay, except for the fact that she didn't need a company computer to access or to provide the information. What was being asked for in the text was an NMLS password. NMLS is a third-party web-based platform. It is not NRA's platform. She was not asked, I need your NRA password. I need your NMLS password. There was absolutely no need... She didn't know it, so she had to get it. So she had, but she had two alternatives. She was, and she was given those two alternatives. She could have said, I don't know it, in which case, Dobie, who was the supervisor asking for it, said to her, I can have IT sift your emails to find it. Okay, so there was no reason that Nicole Durenlau needed to access NRA's database for any reason whatsoever. Number one, NMLS, again, is not NRA's database. It is a third-party platform, had nothing to do with NRA's database. And she could have offered one of two answers, I don't know it, or have, take the offer of having IT sift through her email to find the password. There was no reason that she needed to contact a third party, who in this case was the other appellee, Jamie Batyshevsky, to ask her to access NRA's computer. There was... What was her intent in doing that? Intent is of no consequence. Doesn't it require fraud? Under Van Buren, the purpose of why somebody accesses or does what they do is not for a proper analysis. Van Buren really doesn't help you at all. The conduct that was deemed not liable in Van Buren was far more reprehensible than the conduct you've pleaded. I disagree entirely. And the reason is, is that the conduct in Van Buren was that you had somebody who admittedly, by both sides, was authorized to access the computer database. And he was authorized by everyone's agreement to access the license plate information, which was at issue in the case. What... Not for the malevolent purpose he was accessing it for. Well... We have sort of the inverse of Van Buren here. Yes. We have a situation where the boss says, you need to get this done.  Durenlouw's out on a collie. Okay. And Durenlouw says, well, I don't have that. And then Dobie says, well, you can get it this way. And the mistake that you allege, as I understand it, is that instead of doing what the boss instructed, which was to go through the authorized channel that Dobie noted, she went through a different channel by calling her friend and having her friend do it. That's what happened, right? No, it's not what happened. And I'd like to correct that misstatement of what happened.  The timing is critical, and the timing is documented in the record by virtue of the text messages and the cell phone records that have been analyzed and cited in the record. Dobie contacted Durenlouw and said, I found this outstanding invoice on your desk. We need to get it paid. I need your NMLS password. Not your NRA password. I need your NMLS password. Nicole doesn't, Durenlouw doesn't respond. More texts. I need this. This has to get done. Nicole Durenlouw provides the password to the NMLS, not her NRA password, but the NMLS password prior to the email from Steve Kuzik, the boss, saying this has to get done before that email is even sent. And that email from Mr. Kuzik, which appellees in the district court view as the proverbial smoking gun, that is a very telling email in and of itself. It says, this must be done today. I don't care how you do it. I am not learning NMLS today. He didn't say, I am not learning NRA's computer, because that would have been ridiculous. He understands that. This was a third-party platform. You're making an argument that you would make to a district court, a trial court. At this point, we got a very comprehensive 61-page opinion of Judge Wilson, and you're telling us what's wrong with it on the facts in terms? Let me take a step back. These two people are fired. They immediately, they say that they were sexually harassed throughout their time there. A couple months later, you file a suit against them, claiming that they somehow violated two federal statutes and therefore committed a federal, in effect, committed a federal crime. And my first question is, would your client have sued the employees if the employees didn't claim that they were sexually harassed? Of course, but the fact of the matter is that the district court dismissed all of the appellee's post-employment retaliation claims. Of course what? I'm sorry, I'll let you explain yourself. I didn't understand the answer. The issue here is that the lawsuit against the appellees in this case was filed before the assertions of sexual harassment. No, I don't think so. I thought when they were fired, didn't their attorney say something the next day that, at least, Bataszewski was fired? She was sexually harassed by, among others, Cusick continually. Is that correct? Bataszewski wasn't added in as an additional defendant until after the original complaint had been filed in this matter against Nicole Durenlou. And that was done by NRA's initial counsel. Then we filed an amended complaint on behalf of NRA, in which case we added in Jamie Bataszewski as an additional defendant. I'm looking at Durenlou's resignation. The email says her harassment was the reason she resigned. And then she was sued two months later, right? Her post-employment... She resigned, right? She wasn't fired. She was not fired. And her email said that she was resigning in part because she was sexually harassed. Correct? Well, that's what her email said. That's all I'm asking. Yes. And that's before the suit that you brought two months later, correct? Yes, but the post-retaliation claims... Yes, but what? The post-employment retaliation claims were dismissed by the District Court, and the appellees didn't file for reconsideration of those. So respectfully, I don't believe that that's an issue that's really before the court. The issue here that is essential is the without authorization issue. And to answer your question, would NRA have brought a complaint against them for accessing its database without authorization? Yes. If they had violated company policies with respect to computer use, that sounds like that could be something that you get fired for. But it doesn't seem like that's something that you bring claims against them claiming that they violated federal law relating to the computers and also trade secrets. NRA's computer... I mean, it sounds like you're... It's almost like you sit back and you look at this, and the first blink response you get is, this is the best defense is a good offense. And tell me why that blink response is incorrect. Simply firing the employee for violating the company policy would not address the loss of the confidential or proprietary information to the company or the financial damage or loss to the employer caused by what the employee did on the computer in an unauthorized manner. And so it's not a what's good for the goose or what's a good offense is a good deed. The point is, Durenlo was not fired, you said. She resigned. She resigned. So, and then a couple months later, Badeshevsky, her counsel, said that she was also harassed. And a couple months later, you file a suit under an entirely different federal law that the Computer Fraud and Abuse Act that basically claims that the employees did, they committed a federal crime. Isn't that correct? No, we didn't file a separate lawsuit after Jamie Badeshevsky was fired. The initial lawsuit that was filed by NRA's first counsel did assert a CFAA violation. We amended the complaint and added additional CFAA violations. And now we're back to Van Buren. How does Van Buren help you? Because if the consequences to employees nationwide is that anybody who violates an internal company policy under your reading commits a federal crime. Except that we don't have to get to the company policy, per se, of Van Buren. And Van Buren also specifically didn't address whether authorization turns on code base or technological provisions. But why did you bring a claim that these persons violated two federal laws, the CFAA and the Trade Secrets Act? Because they accessed NRA's database without authorization. And that is why the Van Buren case is wholly distinguishable from the facts of this case. Van Buren didn't turn on whether or not the authorization, whether there was authorization. Van Buren turned on the issue of exceeded authorization. And in footnote 8 of Van Buren, the Supreme Court specifically said, we are not going to address whether or not code-based restrictions, technological restrictions, or policy-based restrictions factor into the gates-up-gates-down inquiry. And they didn't have to. Because in Van Buren, the parties stipulated that Van Buren, A, had access at the time of the alleged act. And two, that he had authorization to access the information that he was accused of accessing it. And the government in Van Buren was arguing, well, he did it for an unlawful purpose. Which he was. It was obvious he was. Which obviously he was. Right. And here we have the inverse. Here we have someone trying to do what the boss says, but doing it in an improper way. Because isn't it true that Doby suggested to Durand-Lo, quote, Doug can sift your emails, or you can share your log-ons so we can pay this today? No, it was the NMLS. She didn't say that? It was the NMLS log-on. And that's the critical component here. I didn't say anything about NMLS. I didn't say anything about NRA. I'm asking you if it's true. This is a direct quotation from the appendix. So if the appendix is wrong, please educate me on that. Appendix 3970, quote, Doug can sift your emails, or you can share your log-on so we can pay this today. Doby said that, right? Doby never asked her for her NRA. That wasn't my question. Did Doby say what I just quoted? Doby said yes. Okay, then may I ask a follow-up?  Thank you. My follow-up is, who's Doug? Doug is head of IT. Okay. And when she said you can share your log-on, what does that mean? They were talking about NMLS. NMLS is a third-party platform, which is not NRA's platform. She was never asking for Nicole Durenlau's NRA log-on. All right, you told me a bunch of things she wasn't doing. Let me try to ask the question again. What did she mean, or what does it mean when she said, you can share your log-on? What is that? The log-on is Nicole Durenlau's log-on to NMLS, which was the issue at hand, which was the payment that was due that day. Okay. And she didn't have her password, and so she called Petoshevsky to get the password, right? Correct. The only way she could get her NMLS credentials, or password, or log-on, was to get into her NRA password to find it. That is incorrect, because NMLS is a third-party website. She could have gone on to NMLS using any computer, hit, forgot my password, and they would have given her whatever prompts. She never needed to. But she already had a password. It was just, but it was in her files at her employer, at NRA, right? But your question, Your Honor, if I understood it, was she needed to access her passwords internally at NRA, and that's incorrect. She didn't need to do that. No, I didn't, I wasn't assuming she needed to do that. I was assuming that she was doing the easy thing, and the easy thing is, you know, call a friend, get into my system right now, and tell me what my password is, and then we can solve the problem that the boss identified. But the problem with that is that password sharing, and giving your password to somebody who otherwise... Is against company policy. No, is also an unauthorized access, because of the fact that Bataszewski herself couldn't sit within the four walls of NRA, and access the information that Nicole Durenlau was asking her to obtain for her, because she didn't have authority to access that section of NRA's database to get Nicole's files, because they were not only not working together, Nicole was not her supervisor, but they weren't even in the same office. They weren't even in the same county. Nicole Durenlau's office at the time was in Camp Hale, which is in Cumberland County, Pennsylvania, whereas Jamie Bataszewski was sitting in NRA's offices located in Dauphin County in Harrisburg. Okay, let me... All right, and the CUSIC quotation, the how you do it is your problem, you pointed out that statement of CUSIC, sort of get this done by any means necessary, that was made after Durenlau had already reached out to Bataszewski, and let's call it the end run. Yes. Durenlau had already made the end run. Right. Okay. And the critical fact here, too, that is very important, and that the district court never even addressed, was the issue of what happened on January 7th. Right. On January 7th, there was no fire drill. There was no, this has to be done today. There were no emails. There is no plausible reason why Nicole Durenlau would need to contact anyone at NRA to do anything, and not only... Isn't it possible to infer that a responsible employee who was out on sick leave might anticipate having to do something like what had happened on January 6th, and it would be good to have all your passwords available in case the boss called with a different urgent matter? Well, assuming that in the hypothetical, assuming arguendo that were the case, one would say, then, why wouldn't she have had the password spreadsheet sent to her on the day of the actual fire drill? She wasn't being a good employee. She called the day after. There was nothing going on. Well, from your submissions, that wouldn't have changed your argument, though. I'm sorry? You would still have said that that was a violation of CAFA. Had she done that? There was a violation on both days. And the fact of the matter is, to Judge Hardiman's point, wasn't she just being proactive? No, she was not being proactive. And we're all talking about the idea of purpose. And Van Buren specifically said that purpose is of no consequence because Congress removed purpose out of the statute. So the actions... Van Buren is very, very different. I'm looking at it again right now. And that seems to me factually to be so distinguishable from this case that it doesn't really help you. It doesn't. But the gates-up, gates-down inquiry, assuming arguendo that this Court would say that, yes, she did have authority, and you had to go to the was-it-was-there with, you know, exceeded authorization, then it does from that standpoint. But I would agree with you that this case is factually distinguishable from Van Buren. This is a case about authorization and what she did with the computer. And what she did with the computer, she had no authority to do. And with the fact of Jamie, the District Court didn't even address Jamie Badaszewski's role in the unauthorized equation of the analysis. And that is that Jamie Badaszewski did not have authority to enter into the area of NRA's computer database to access the information that Nicole Durnlau was directing her to do. She could not have done it. Even though she was sitting within the four walls of NRA, even though she had access to NRA's computer, she did not have access to that particular area of the computer. And case law is clear that by encouraging somebody to backdoor and giving them the credentials and using those credentials of someone else to access an area of a computer system that you are not otherwise authorized to access constitutes unauthorized asset authorization. Computer CFAA primarily involved with, for example, hacking into. I'll give you an example. A number of years ago, an executive for the St. Louis Cardinals hacked into the Houston Astros accounts for purposes of looking for information that he thought was taken by an employee who left the St. Louis Cardinals and went to the Astros. The person, it turns out, he hacked into the account, violated the act, and got prison time. Where is the hacking here? This was somebody just trying, as Judge Hardiman said, you had a 9-1-1 situation. You've got to get something done now. The boss is saying, get it fixed now. Don't tell me how you get it fixed. Don't tell me, yeah, just get it done. And so where's the hacking? Okay, the hacking is that at the time that I get it fixed, and it wasn't per se get it fixed, I am not learning NMLS today. It was also how you do it is your problem. How you do it is your problem. I am not learning NMLS today. Again, this was not involving NRA's computers. And this is a clear case. I don't understand how you don't get authorization out of that. When the boss calls me and says, get this done now. I don't care how you do it. I don't care how you do it. But she already provided, at the time of that email, that password had already been provided. She already provided Dobie with the password to NMLS. So it was after the fact that that email from Mr. Kuzik came in. So anything that happened after that email came in cannot be excused by that email, including the events of January 7th, which are not addressed at all by the district court. Right. I understand what you're saying that because of the timing here, the how you do it is your problem can't be viewed as a permission to do it because she had already done it. But it might be ratification. It might provide some protection on the back end as a ratification for what she did. It doesn't. It's inconsistent with the purpose of CFAM, Commuter Fraud and Abuse Act. I can't imagine that Congress contemplated a situation like this. It requires intent to defraud. You concede that. That's the statute that requires that, right? Yes, but the statute. But I asked that question and you said no. No. I wanted to, yes, to answer your question, the intent to defraud, but for purposes of proving intent. Why is it yes when he asks the question and no when I ask the question? No, I'm sorry. There were two questions coming at me, and I apologize. I'm recovering from the flu, and I have fluid in my ears. And so hearing two different voices, I apologize. To answer the question, yes, intent to defraud is an element of the CFAA. But going back to the question that Judge Hardiman asked about, you know, wasn't this being proactive, no, it wasn't being proactive on her part, going back a second time on January 7th, for the simple reason that she sent an email on January 6th saying, it's done, I've paid it, we're all good. So on January 7th, there is no being a good Samaritan, there's no being a good employee, there's no being proactive. She says and acknowledges crisis averted, we've taken care of it. And by the time that Chief Kuzik's email came to her on the 6th, the password had already been provided. Where's the intent to defraud on January 7th? For purposes of CFAA, you don't have to prove intent to defraud in the truth. Because then you'll get a yes. I mean, I'm asking you, you ask the question. The intent to defraud is that they knew that they were not permitted to access the computer database. That's so helpful, because that's, I think that's why both of us were asking these questions, because if it's enough to prove intent to defraud under the statute, to prove that some employee goes into a part of the company's network that you don't have authority to go into, then you're on really solid footing here. But I'm not sure I agree with that. I'm thinking about that. And I'm wondering why we should not instead follow what the Seventh Circuit has said. And I'm quoting from the FIDLAR text case at page 1079, where the Seventh Circuit said, intent to defraud, as used in other statutes, means that the defendant acted willfully and with specific intent to deceive or cheat, usually for the purpose of getting financial gain for himself or causing financial loss to another. I have two questions about that quotation from the Seventh Circuit. Number one, if we follow it, do you lose? And number two, what's wrong with it? Well, as a preliminary matter, the appellees have conceded that we only need to demonstrate unlawful access and not the elements of common law fraud to state a claim under the CFAA. Okay. And the case law supports that, and that's Phillips Med System versus Netteland Media. Okay. Could you just answer, before you get on to that, could you answer my two questions? If we follow what I just read from the Seventh Circuit, do you lose? And the second question is, what's wrong with what the Seventh Circuit said there? I apologize, Your Honor. The issue, can you repeat? Sure. I'm sorry. No, no, no problem. Here's what the Seventh Circuit said in the Fidler text case at page 1079. Intent to defraud means that the defendant acted willfully and with specific intent to deceive or cheat, usually for the purpose of getting financial gain for himself or causing financial loss to another. Well, in this case, they clearly acted with an intent to defraud and to deceive. And they, by virtue of their testimony and depositions, Jamie Batyshevsky acknowledged to the police that what she did was totally wrong and that she could get into very big trouble for what she did. Wrong because she violated company. I think, I can't speak for my colleagues, but I think, I know I'm with you on this. They've done something wrong under company policy. That's clear. They made a mistake, both of them, right? The boss said, you need to get this done and here's a way to do it. She didn't do what the boss said. Durand-Lau went and ended around to Batyshevsky. And then Batyshevsky entered somebody else's credentials, which she knew or should have known was against company policy. So that's all baked in here. You know, they did something that you could say was certainly against company policy, perhaps even morally wrong. But that doesn't answer the question of whether they're liable under this federal criminal statute, which, as Judge Amber pointed out, is certainly at least intended to get hacking and hackers. But maybe it gets other conduct too, and that's what we're trying to figure out today. And I'm asking why, what the Seventh Circuit said there about deceiving or cheating, usually for the purpose of financial gain or causing financial loss. Because I don't see any financial gain to Batyshevsky or Durand-Lau. I don't see any financial loss to the company. I see the NMLS problem getting solved and getting solved in a way that was not entirely kosher. That's what I see. But tell me what I'm missing here.  Well, clearly, I mean, going to the elements of the Seventh Circuit case, they acted willfully. They both understood that Nicole Durand-Lau didn't have access, didn't have authority to access the computers at NRA, which is why she enlisted Jamie Batyshevsky's help in the first instance. Because Jamie Batyshevsky, but for that, wouldn't be involved if she did have authority to access, because she wouldn't have needed to contact Jamie in the first instance. But with regard to the willfulness, that we can see the willfulness in terms of what happened on January 7th. First and foremost, there's no fire drill. There's nothing that's being required of Ms. Durand-Lau to do. She contacts Ms. Batyshevsky. They have a 12-minute, approximately 12, 14-minute telephone call. And during this time, a password spreadsheet is emailed by way of Ms. Batyshevsky sitting at her computer posing as Nicole Durand-Lau and accessing an area that she's not otherwise authorized to access. Pulls a document, which is a password spreadsheet, and sends that with a subject line with a winky face emoji. What did the NRA do when it discovered that the passwords had been emailed? When they immediately found that out, at that point, Nicole Durand-Lau had already resigned. Batyshevsky was fired. Did it change the passwords? Not only did NRA immediately begin to change the passwords, but they also had to do the damage control because What was the independent economic value of changing a password? In other words, the passwords get changed. Where's the harm after that? Was there proprietary information that was out into the marketplace? Yes. What was it? And that proprietary information is What was it? The password spreadsheet was No, not the password. What was the proprietary information? The password spreadsheet was a client list. And the password spreadsheet was a list of all of NRA's clients and how you access the information that was confidential and proprietary to those NRA clients that NRA was contractually entrusted to protect by virtue of a client relationship. So this isn't just a password issue here. This password spreadsheet was ideally a client list. And that password spreadsheet that was sent willfully and intentionally with an intent to deceive, as evidenced by the winky face emoji, and sent unencrypted to a Gmail account That comes in under the rules of evidence, whether or not a winky face emoji has that significance evidentially. Well, it's undisputed that it was a winky face emoji. I'm saying I'm not sure it's nationally known. That's what a winky face emoji means. But the independent economic value question is that the password spreadsheet was a client list. And they That answers the question. You're saying that the clients of NRA is proprietary to NRA and that shouldn't get out in the public. And it did. And it was sent to a Gmail account unencrypted. So there's no way to control the dissemination of the information from there. It was out there on the dark web. Okay. And so there's the harm. So to the question that Wait a minute. It was out there on the dark web? I mean, did somebody make use of it in order to harm NRA? There's no way to know. Once it's sent via Gmail unencrypted, it's out there. But what you're stating is that you knew it was on the dark web. It was just sent to a Gmail account. Once it's out there, it's out there. And it's out there It could end up on the dark web. It could end up. Okay. Yes. Okay. All right. We've gone over time. We've saved time for rebuttal. So let's hear from your friend on the other side. Mr. Iannacone. I'm not sure I pronounced that correctly, but you'll help me out with that. Good morning, Your Honors. May it please the Court, Corey Iannacone from Pillar Hawk and half of the appellees defendants in this case. As this Court has raised earlier, context is very important in this case. And I think what is fatal to appellants' claims of appeal here comes down to theory of the case. And to give you just the background, my clients have always contended, as was noted earlier, that this is a sexual harassment slash retaliation case. Both of my clients worked at NRA. Both of my clients were subject to harassment at NRA. And both of my clients had provided formal demand notice of claim letters to NRA. And in direct response to those letters outlining the claims they had, this litigation, the claims which are now before this Court, are what were filed against them. Just context, Ms. Durenlew, who was raised earlier, she filed her notice of claims one day after her resignation letter, which noted sexual harassment. So it was February 21st of 2021. After that, she was sued, one count, original complaint, only against Ms. Durenlew, a couple months later, under one count under the CFAA. Ms. Badechesky provided her notice of claims and her demand on May 17th, 2021. Two days later, May 19th, she was added to the complaint, and we have the full nine counts that are now before this Court. So you've done a good job laying out a potential motive that NRA had in bringing these claims. But even if their motive was retaliatory or worse, it doesn't mean that they don't have a case. Absolutely, Your Honor. All right. And here, your clients, can we agree your clients did some things wrong? At least based on company policy? If we clarify specifically, possibly an employment issue, allegedly, maybe. Well, isn't it obvious? Yes. I'm not sure it's a maybe because it's sort of understood in this world, I think, that you don't share your credentials and you don't share your passwords. And let's face it, Dobie gave her an end around, right? Dobie gave her an option. Get it done. Get it done. And here's a way we can get it done by, let's call this the authorized improper action, right? The authorized improper action is that Doug can sift your emails. Presumably, Doug's not supposed to sift the emails, but Dobie said, Doug can do it, or you can share your logon with Dobie. So she had a couple of options to sort of fudge company policy, and she would have been protected because her boss instructed her, but she didn't choose those options. She chose to phone a friend. That is correct, Your Honor. But to come back to the issue of context, which I initially brought up for the oral argument, ordinarily I would agree and say, yes, we have company policy issues. It looks clear cut. However, the problem in this case is I came back to theory. Remember, when the complaints were filed against my clients, they responded and answered and said, with regards to the January 6th-7th incident, the email we're talking about, they said, whoa, timeout, timeout. We had authorization. Number one, we were still employed there. We had access to the computer system. But number two, Ms. Durenlew, I didn't want to do work. I actually was told to do work while I was on leave. And if you look, discovery was property. Right, and she could have possibly just said, look, I'm on leave and hung up the phone. She could have done that, and she wouldn't have been in any trouble if she had done that. I respectfully disagree with Your Honor, and if I may just point to the record, which I think is critical, what discovery came out, it corroborated my client's version of events, the theory. And more specifically, there's a number of text messages. This Court has already highlighted some. But the one from Ms. Durenlew, the back and forth, where she literally tells Mr. Cusick in the email, I don't have the papers. I'm not sure what to do from home. Clearly acknowledging an issue, she's at home. This is when you get into the response, as the Court's already noted. It must be finalized by the end of business today. How you do it is your problem. But she had already done it by then, correct? Well, the email that was raised earlier was sent after this too. And just for more context, so this Court fully understands, the sexual harassment claims from Ms. Durenlew came to a head November of 2020 before. And she did file a formal complaint with HR. Her position is, ever since she filed it, she's been getting pressure and forced out since then. This is the type of conduct, pressure, trying, she was under the belief she was going to get fired or trying to fire her. That's why she is, you have an employee who is trying to do anything she can to get the job done, to ensure she's not fired. So just context, I believe, is helpful for this Court. But it still comes back to policy violations, as this Court noted. I do not believe that the CFAA is intended to cover employee, company policy violations. Well, that's true. But we're living in an age of, you know, careful attention of the text of the statute. And, you know, you have to engage with the text of the statute, even if that's not what Congress had in mind when they passed the statute. And all it says is intent to defraud. So what does that mean? Should we follow the Seventh Circuit, or what do you think about that? Which is a very good point, Your Honor, the background and the intent of the statute. This statute was enacted in 1986, and it was enacted as a criminal statute was the purpose. We have to look at the context to see, is this what this context, the fact pattern you see, is this what it was intended to be protected by the statute? I don't think it is. I don't think that's the right analysis. I think the right analysis is, does this conduct violate the words of the statute? I don't believe it. And I'm asking you to tell us why this is not an intent to defraud, and I'm asking you whether we should follow what the Seventh Circuit wrote in Fidler Technologies or something else. I agree with the quote you've cited from Fidler Case earlier. I do point out that the intent to defraud is not here in this case. It comes down to what other reason. The theory, the one theory that's been brought up in this case, and the facts support it, is what my clients explained. We were just trying to get this done for NRA and for Mr. Cusick and Ms. Dahby. That's the only reason. We've asked them. Should we write an opinion like that that says even if an employee does something they're not supposed to do with their computer as long as they're responding to the exigencies of the workplace as directed by the boss, then they get safe harbor? Is that the way we should write that opinion? That sounds a little broad. It sounds a little bit risky. I don't think the court has to go that far to take it that broad. I think it literally comes down to the end of the day of saying this is enacted as a criminal statute. We're looking at this as clearly we have two employees who have access to NRA's computer system. This is distinguishable from other case law relied upon by appellant here where they look at where the employment relationship is severed, where the employee is actually terminated, and then it creates a question. Well, they've accessed it after termination. This is essentially a case. There's the Dressler-Rand case out there that draws the analogy to a burglary. If you give a person a key to the home and then the person goes through the window, which is not the intended way to go into the home, maybe some other crime has been committed, but you still provided the key to the person. The key is access to the computer system, which is clearly given to my clients here. Well, but if you give the key to the house to your plumber because you're at work and the plumber goes in and then the plumber cracks your safe, then we've got a problem probably, right? Not the unlawful entry. You gave them access. Another crime might have occurred there, but you gave them access to your house. How is it different from Van Buren? Van Buren, why isn't this case Van Buren from your submission? Well, obviously, it's clearly distinguishable as far as we talk about inverse motives out there. But aside from that, it is – I mean, Van Buren stands for the proposition of the police officer has access to the computer system, and we're not going to over-evaluate this. He had improper motives for what he did, running plates, but he still had access at the end of the day. So we're not even going to get into why he's doing it and everything. Once you gave him access, he had access. Well, what – pretend it was – not during the law who asked Batashevsky to send the spreadsheet on the 7th, but someone who didn't work for NRA. Wouldn't that be a different outcome under the CFAA? Obviously, not a fact here before the court. If there's somebody – I got it. I know it's not a fact before us. I'm going to ask you to – it's a hypothetical. Somebody outside accesses, then there would be an issue because you have somebody who's not employed by NRA, right, accessing the system. And there are cases that talk about somebody who's outside. I mean, is there a scenario under which an employee, without hacking so-called, could actually violate either the CFAA or the Trade Secrets Act by – in the example I just noted? Without intent to defraud. Without the intent to defraud. Because the intent to defraud is not in that example. Right. Well, the issue – CFAA counts two and three in the – two and four in the complaint, specifically requiring intent to defraud. The other ones focus on without authorized access. So the key in – the Defendant Trade Secrets Act is a separate act from the CFAA. It has different elements. But could you just repeat that? What I'm just saying is a pretender assumed that it wasn't Durnlow that asked Pataszewski to send out the spreadsheet on the 7th, but someone who didn't work for NRA made the request. Would that be a different outcome under the CFAA? It's hard to speculate with all the facts, Your Honor. But, yes, theoretically, it very well could be because it sounds like the person from the outside, not knowing who it was or who the person is, doesn't have access or wasn't provided a key at all. So I have a question. There seems to be this issue of access. Why does that person have access to get in? Well, we don't know.  But is there a scenario where there could be an employee violation of the company policy that also rises to the level of violating the federal statute? The answer has to be yes. Yeah, the answer has to be yes because it does occur. Employees who clearly have no access whatsoever to certain areas and go to certain areas of computers that have certain files possible, theoretically. Let's talk about January 7th for a minute. Why did Pataszewski log in as Durnlow on that date? To send the spreadsheet with the passwords. Why did Durnlow need those passwords on January 7th? It goes back to the other close. We're not talking weeks difference. We're talking like maybe a 24-hour gap somewhere in there. And it goes down to someone who's at home with COVID leave. And I mentioned before, as far as feeling pressure to do work at home, ensuring she has the passwords to do any work that might be required of her, knowing that she theoretically could be working from home now, having to do work. And she knows, though, she's not supposed to log into her work computer from home because you're only supposed to log into the work computer if you have a work laptop. And she was not provided a work laptop, correct? Per company policies, correct, Your Honor. So it sounds like you're, to get back to where you started, your theory of the case is she was put in a catch-22. They want her to do work, but she doesn't have the tools to perform the work in accordance with company policy. And she did pursue and runs around company policy in order to respond to the requirements of her superiors. Is it as simple as that from your perspective? In short, yes, Your Honor. All right. Thank you, sir. Thank you, Your Honor. We will hear the rebuttal from your friend on the other side. Thank you, Your Honor. The definition of intent to deceive taken from the Seventh Circuit, where the defendant acted willfully and with intent to deceive and to cheat, their definition is inconsistent with the CFAA's definition of the word, or deletion of the word purpose from the statute. And my friend argued at length about the why, the why his clients did. But in the absence of the deletion of the word purpose, that's a superfluous argument. The why is not whether or not a violation of the CFAA has occurred or has not occurred. Moreover, it's important to note, and my friend I think conceded this point, that intent is only required for subparts A4 and A6 of the CFAA. We've sued under four separate prongs of the CFAA. So the intent concept for purposes of those other two sections that don't require that, this explanation of the why is not essential to this court's analysis, and in fact I would argue is a little more. Has NRA ever sued any other employees under the CFAA or the Trade Secrets Act? NRA has never had a situation that's ever occurred like this before, Your Honor. So the answer is no, they have not. The CFAA is about access, not motive. And whether or not Batashevsky and Durenlou had authorized access is not in dispute. The simple fact is they did not have authorization. Ms. Durenlou did not have a VPN. She did not have a company-issued laptop. In fact, while counsel brought up this sexual harassment and retaliation, I would argue that's a red herring that we should not go down that rabbit hole because that's not before this court. But since you brought it up, one of the key factors in Ms. Durenlou's EEOC filing is that she claimed that she was discriminated against because she wasn't given VPN access and she wasn't given a laptop. And you can't have a... But if purpose doesn't matter, then when Dobie called her, she needed to just say, there's nothing I can do. Exactly. And Dobie said, you can give Doug the information or give me the logon. If she had given Dobie the logon, under your theory of the case, she violated the CFAA? No. Why? The difference is... You can't give your logon to somebody else. Because she wasn't being asked for an NRA logon. She was being asked for the NMLS password. It was a very specific request. She had no time, and it's undisputed, that no time was she being asked for her NRA login. She was being asked for her NMLS password. You can't get that without going into her part of the computer. No, that's incorrect, Your Honor, respectfully. NMLS is a third-party platform, and you can ask... No, but I mean, she didn't know. You're assuming that she remembered her NMLS password, which is kind of a silly assumption. It would be common, if she had a whole bunch of passwords for all these different vendors, it would be common that she wouldn't know that off the top of her head. But the fact remains is that she was not asked for her NRA password. And so to your question, when she was asked... I'm saying what I'm suggesting is in order to get her NMLS credentials, she needed to get into the NRA system. But we can agree to disagree about that, I suppose. You're talking about violations of policy. That's what happened here, right? No, I'm saying this is not a violation. It's not just a violation. They did not violate company policy? They did violate company policy, but it's not just a violation of company policy. So you're saying also they committed a federal crime? It's an end run around a structural barrier access, VPN, so yes. And the consequences of that, how many people in America are employees who access computers in a way that somehow violates company policies? Can you imagine the number of crimes we would have in this country? The difference, Your Honor, there is that it goes to what Justice Thomas said in the dissent in Van Buren, which is we have to look at the circumstances surrounding the Gates Up, Gates Down inquiry, which is why because of this discussion that we're having, these are factual questions that ideally should go to a jury to determine. But to your point, the fact of the matter is, is that Van Buren didn't address whether technological-based barriers or policy-based barriers could also factor into the unauthorized access. And that's why this is essentially a first impression here, because we have a situation where it's not an exceeding company policy. This is there are known existing firewalls in place. Both appellees understood the existence of those firewalls and purposely, intentionally, and willfully violated those firewalls. They had no authority to access. That is the issue here. And they did so with the intent to defraud, not with the intent to solve a problem. Exactly. Okay. We understand. Thank you very much, Ms. McDonnell-Mathis. Thank you, Mr. Iannacone.